**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 20, 2015**

# In the Court of Appeals of Georgia

A15A1192. DORITY v. THE STATE.

BRANCH, Judge.

Demarkius Dority appeals his conviction and sentence on counts of aggravated sodomy, aggravated child molestation, and child molestation and on three counts of enticing a child for indecent purposes in a case involving two victims. Dority was sentenced to 45 years with 35 to serve. On appeal, he contends the trial court erred by admitting certain evidence over objection; he also contends his trial counsel was ineffective for several reasons, including his failure to obtain and review the victims' DFCS and juvenile court records, therapy records, school records, and pediatric records and his failure to seek funds to obtain expert witnesses. Finally, Dority has moved to remand the case and order the trial court to review those records and for

funds to obtain an expert to review them. For the reasons that follow, we affirm Dority's conviction and deny the motion to remand.

When the appellate courts review the sufficiency of the evidence, they do not "re-weigh the evidence" or resolve conflicts in the testimony; instead they defer "to the jury's assessment of the weight and credibility of the evidence." *Greeson v. State*, 287 Ga. 764, 765 (700 SE2d 344) (2010) (citations omitted). See also *Glaze v. State*, 317 Ga. App. 679, 680-681 (1) (732 SE2d 771) (2012) (footnote omitted). Appellate courts determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (citations omitted).

As for the first victim, the evidence presented at trial showed that when Dority was married to Erlande (a/k/a Minnie) Dority, who had two daughters from a prior relationship, Dority approached M. D. — Erlande's then nine-year-old daughter — as she was drying her hair after taking a shower; he put a towel over her face, led her to a bedroom, and had anal intercourse with her when no one else was at home.[1] The

---

[1] At the time, M. D. lived in Dority's home with her mother, her sister T., and her stepsister K. D.

child testified that Dority performed this act with her on multiple occasions in different rooms; she gave a detailed description of these assaults, including that Dority would make her take off her clothes before the incidents; and she testified that his actions hurt her and made her feel bad emotionally. She added that Dority would sometimes use a lotion that had a name beginning with an "A" as a lubricant; that he sometimes put his green and blue bathrobe over her head instead of a towel; and that he would wash her afterwards with wipes. She also gave testimony to the effect that he forced her to give him oral sex on at least one occasion. On cross examination,[2] Dority's public defender established that M. D. first made an outcry as she was about to get a spanking and that she did not tell anyone other than her mother and grandmother about the alleged abuse during the following ten days while she was in Florida with her mother and sister.

Erlande testified that on or about September 19, 2011, as she was about to give a spanking to M. D. for riding the bus to a neighbor's house without permission and as Dority urged Erlande not to spank the child, M. D. started to try to tell her mother about Dority's actions. Erlande testified that the child was not clear and she therefore

---

[2] Because Dority has several claims of ineffective assistance of counsel, we have included the highlights of trial counsel's cross examination of the State's witnesses.

3

proceeded with the spanking, after which the child made clear that Dority had touched her in a bad way. Erlande took M. D. and her sister for a ride in a car and parked; Erlande testified that at that point, the child reported that on more than one occasion over the previous two weeks Dority had put a towel over her head, led her to her stepsister's room, and put something in her butt that felt like it was in her stomach, that hurt, and that made her cry. Erlande drove home, had the girls pack some belongings, and drove them all to meet with Joyce Drayton, Dority's mother, with whom Erlande was friends; M. D. told Drayton that Dority would put a towel over her head and give her a "checkup" on the bed. Erlande and her two daughters stayed at a hotel that night. Erlande testified that she had planned to fly to her best friend's wedding in Florida the next day without her daughters, but instead she skipped the flight and drove to Florida with her daughters and attended the wedding. As she was returning from Florida 10 days later, Erlande sent a text message to Dority that stated "I am relocating out of state and I wish you the best. Wish it ended in other ways and when you requested the divorce, we should have signed it. Too late now." When she and the girls got back from Florida, Erlande took the girls to a hotel, and the next morning Erlande went to work and the girls went to school. That day,

September 29, 2011, Erlande left work early to intercept the girls coming home from school, took them to the motel, and later called the police.

Trial counsel cross-examined Erlande primarily on the fact that there were some discrepancies in the evidence regarding in which room the child said the incidents occurred; the fact that M. D.'s sister T. D. had once sent pictures of herself to a 17-year-old male and that she was viewing pornography on a computer; the fact that Erlande did not call the police for 10 days after the child's initial outcry and went to Florida during that time; and on the fact that she sent the girls to school after returning from Florida before calling the police.

After Erlande made a report, Detective Christopher Bertera met with her and then contacted a children's hospital to set up a forensic interview for M. D., which occurred on October 7, 2011. Bertera observed that interview on closed circuit television. A redacted form of that interview was authenticated by Bertera, admitted into evidence, and played for the jury, but the interviewer did not testify. In the interview, the child gave very similar testimony about Dority's actions as she did at trial, including significant detail about exactly what happened. The video reflects that the interviewer asked open-ended and non-leading questions throughout.

Bertera then interviewed Dority and later searched his house pursuant to a warrant. A redacted video recording of the Dority interview was played for the jury. The detective also testified that he tried to set up an additional meeting with Dority but that Dority cancelled, saying that his wife had been in a bad accident and was being rushed to the hospital. At a subsequent meeting with Dority, and after reading Dority his *Miranda* rights, the detective confronted Dority about his excuse for cancelling the second meeting and accused him of lying. Dority responded that his wife had chosen not to go the hospital and that, instead, he had to handle some related insurance matters.

When officers searched Dority's home they recovered a bottle of almond oil from a kitchen table, a container of Vaseline cocoa butter lotion, and a blue and green striped bathrobe from the master bedroom; the officers also took a photograph of a box of baby wipes. Dority was arrested and placed in jail on November 18, 2011. Trial counsel cross-examined Bertera about how Bertera did not run any forensic testing on Dority's cell phone; how he did not take fingerprints from the bottle of almond oil; how Erlande and M. D. were in Florida for ten days between the outcry and calling the police; how there was evidence that M. D.'s sister had been texting an older boy and looking at pornography; how there was an error in Bertera's report

6

regarding the room in which the incidents occurred; how Dority was under no legal obligation to appear at the second scheduled meeting with Bertera; and how Dority cooperated with the investigation.

Kelley Gaskin, a pediatric nurse practitioner with significant experience in evaluating and treating children suspected of being victims of sexual and physical abuse, was qualified at trial as an expert in child sexual abuse. She testified that on October 7, 2011, after M. D.'s forensic interview, she gave M. D. a medical exam in connection with the allegations against Dority. Gaskin reported that the child complained of pain and bleeding following bowel movements, but the physical exam did not show any injuries related to the allegations against Dority; Gaskin noted, however, that most such injuries would heal within 72 hours. Trial counsel cross-examined Gaskin on how a person who had not suffered the alleged crimes would also present with a normal exam.

The second victim, C. S., is the child of Chad Spriggs and Loria Rogers. Spriggs was married to Tressa Spriggs, and, at the time of the allegations described below, the Spriggs and Rogers families were in a custody dispute regarding C. S. that concerned whether Rogers could properly care for the child given her job as a truck

driver. Rogers, who previously had been in a relationship with Dority, had a child with Dority named S. D. Thus, C. S. and S. D. were half sisters.

C. S., age six at the time of the incidents, testified that she and her half-sister S. D. frequently went to Dority's house[3] to play. C. S. testified that on occasion, Dority showed pornographic movies in his bedroom with the child in the bed with him and that, during the movie, Dority touched her privates under her underwear with his hand and it made her "feel like hell." At times, Dority would also join the child in the shower and bathe her, including her privates. Trial counsel cross examined C. S. on whether anyone else ever gave her a bath at Dority's house and on how C. S. did not like living with her mother, i.e., Rogers.

Tressa Spriggs testified that on September 23, 2012, C. S. made an outcry to her; Dority had been in jail for over 10 months at this time based on the charges related to M. D. In this outcry, C. S. told her stepmother that her half-sister S. D. had been "messing with her and touching her" and that Dority had touched her as well; that Dority showed her pornography and told her that, like the girls in the video, she should like it too; and that when asked where she had been touched, C. S. pointed to her privates. On cross examination, Tressa admitted that C. S. had also accused a

_____

[3] This was apparently the same house where M. D. lived.

different man, "Uncle D," of showing her movies and touching her at some time in the past and that she had never recanted those allegations. On redirect, Tressa testified for the State that she never coached C. S. on what to say. Trial counsel did not directly rebut this testimony about coaching C. S., but he raised an implication that she had by getting Tressa to admit that Rogers and the Spriggs family were involved a custody dispute over C. S.

Chad Spriggs testified that on several occasions in late 2010 and 2011, he noticed that C. S. was troubled about something and would cry and say that someone had touched her but little else. After the child's statement to his wife, Spriggs contacted DFCS, but DFCS took no action. On cross examination, Spriggs admitted that he and Rogers were in a custody dispute about C. S. at the time of the outcry; that C. S. would sometimes make similar allegations then back off and say that the incident did not happen; and that C. S. had made unrecanted allegations that Uncle D. had touched her improperly.

On December 4, 2012, more than two months after C. S. made the outcry to Tressa, Chad Spriggs took C. S. to the Douglas County Sheriff's Office. The child then reported essentially the same incidents described above during a forensic interview by Investigator Cindy West; a redacted portion of the video of the interview

9

was played for the jury. West testified about the proper techniques of forensic interviewing of a child victim. Trial counsel cross-examined West and established that West did not interview M. D., S. D., or Tressa Spriggs; that C. S. reported that she had never seen Dority naked; that C. S. was reporting about incidents that had occurred over a year before her outcry when she was only six years old; and that the child's mother and father were in a custody dispute at the time of the outcry.

The State also presented the testimony of L. D., who the defendant adopted when he married L. D.'s mother when L. D. was a young girl, to testify regarding a similar transaction. L. D., age 28 at the time of trial, testified that on two or three occasions when she was about 10 years old, Dority would call her into the bathroom, have her take off her clothes, and check her private area to see if she had cleaned herself correctly. He would make her sit on the counter facing the mirror and use her hands to show him inside her vagina. On the last occasion, he asked if she felt uncomfortable and whether she "felt like he would molest" her; L. D. responded, "yes," and Dority did not repeat the behavior thereafter. Trial counsel cross-examined L. D. on how she had a good relationship with her father otherwise; on how Dority never touched her improperly; and on how she never saw him improperly touch any other children and how no other child ever said he had done so.

10

With regard to M. D., Dority was indicted on counts of aggravated sodomy and aggravated child molestation and on two counts of enticing a child for indecent purposes. With regard to C. S., he was indicted on counts of child molestation and enticing a child for indecent purposes. Following a trial by jury in June 2013, in which Dority did not testify and presented no witnesses or other evidence, Dority was convicted on all counts.

**Post Trial Motions**

Dority filed a motion for new trial, and upon obtaining appellate counsel, filed amended motions for new trial, sought a continuance of the hearing on the motion for new trial, and filed motions requesting that the court issue a subpoena or court order directing the production of the victims' DFCS and juvenile court records, therapy records, school records, and pediatric records for an in camera review by the court. Dority sought a court order based on the belief that if he were to serve subpoenas for the records himself, the record holders would file motions to quash, thus ultimately necessitating a court order. Dority sought the records in connection with his assertion that trial counsel "was ineffective for not requesting record access for the two alleged victims to promote defense case theories and challenge witness credibility." Dority stated that he sought the records for the purpose of "substantive use by counsel and

11

defense experts, and for purposes of impeaching the alleged victims' credibility" so that he could prove the prejudice prong of his claims of ineffective assistance of counsel. Dority also moved for county funds to retain an expert medical practitioner and an expert child psychologist to review any records of the victims that he might obtain via court order and to give testimony at the hearing on the motion for new trial.

The court held two hearings regarding Dority's discovery motions during which trial counsel testified about his decisions not to seek discovery of the records at issue and not to seek funds for expert witnesses. At the close of the second hearing, Dority's appellate counsel argued to the court,

> [T]here's no question that when we're trying to get these records, it is speculative to a certain extent. I don't know what is going to be in these records, but the law is crystal clear under OCGA § 49-5-41, [that] the Court will perform an in camera inspection upon request for an issue that may . . . be determinative of the issue before the Court.

Later, having no decision from the court on the discovery motions or on a pending motion for a continuance, Dority's appellate counsel served subpoenas on the targets of his discovery requests and demanded that the records be produced and the relevant witnesses appear at the upcoming hearing on the motion for new trial. Meanwhile, on June 12 and 13, 2014, the court denied Dority's motions for the court to issue post-

12

trial subpoenas and for post-verdict expert witness funds. At the beginning of the hearing on the motion for new trial, the court refused to allow Dority to use or file documents that had been produced in response to Dority's own subpoenas on the ground that the court had already ruled on Dority's discovery motions.

**Hearing on the Motion for New Trial**

The court then held a two-day hearing on the motion for new trial. At the hearing on the motion for new trial, Dority presented the additional evidence described below, including three witnesses, evidence regarding a recording of C. S.'s initial outcry, a forensic report regarding C. S., and other evidence.

Loria Rogers, C. S.'s mother, testified that she had a conversation with C. S. in which the child denied that Dority touched her but said he was "about to" or "almost did," and that "Teresa" (apparently meaning Tressa Spriggs) told her that other girls had been touched, which conversation Rogers audio taped; that Tressa hated Rogers and had a motive to obtain custody of C. S.; that the child loved Dority and called him "Dad"; that the DFCS investigations triggered by the Spriggses yielded no results; that C. S. enjoyed Dority's company and never claimed Dority touched her prior to the time that Rogers lost custody to the Spriggses; and that the child had not seen Dority for almost two years before the outcry.

13

Joyce Drayton testified that when Erlande brought M. D. to her home following the child's initial outcry, Erlande seemed more concerned with her trip to Florida than the child's allegations and that when the child spoke to Drayton, she would not look Drayton in the eye. But she also testified that the child told her that Dority had touched her inappropriately and that he had had sex with her. Drayton told Erlande to do what was right for the child and to take her to the doctor to have her examined.

L. D., who was present at Dority's first appearance hearing on November 21, 2011, testified that Erlande Dority told the magistrate at that hearing that M. D. had made up the allegations because she wanted to go on the trip to Florida with her mother and that the allegations were not true. A newspaper article from the following day appears to corroborate that retraction. But neither L. D. nor any other witness testified at trial to this recantation by Erlande. L. D. testified that trial counsel never questioned her prior to the trial about her knowledge of the case; they exchanged only pleasantries.

Although at trial, the Spriggses testified about how C. S. made an outcry to them and mentioned that they recorded the outcry, the recording was not introduced into evidence. Trial counsel testified at the hearing on the motion for new trial that he received the audio from the State on the Friday before the Monday trial, that he

reviewed it, and that he decided to try to keep it out of the evidence because, although some portions of the audio might have been helpful to his case, overall the audio was very prejudicial to the defense. At trial, trial counsel objected on the grounds of the late production and the prejudicial effect and stated that he hadn't had enough time to review it; the audio was not admitted but the Spriggses were allowed to testify about the child's outcry. Trial counsel testified that the audio also revealed that the Spriggs did most of the talking, that the Spriggs' questioning of C. S. was very suggestive and leading, and that Tressa, not C. S., first mentioned the possibility that Dority had touched C. S.

In January 2013, Julie C. Medlin, a licensed psychologist, evaluated C. S. and prepared a report entitled Forensic Sexual Trauma Evaluation (the "Medlin Report") at the request of Chad Spriggs's attorney. Some time before trial, an unknown person left a copy of the report in trial counsel's office. Trial counsel, however, was not sure he was supposed to have the report; he thought that it might be protected by a privilege, and he did not present a copy to the State or reveal that he had it. He testified at the hearing on the motion for new trial that he did use information he learned from reading the report to ask several cross examination questions of various witnesses. Trial counsel admitted that he could have raised with the court whether the

report was privileged but that he "didn't want to have to, quite frankly, get into all that."

Finally, Dority presented other testimony about other aspects of the trial that will be discussed below. Following the hearing on the motion for new trial, the court denied the motion in a detailed order, and Dority filed the present appeal.

1. Dority does not challenge the sufficiency of the evidence. But the State presented evidence that Dority molested three young girls, the two victims and L. D., each of whom was at the time of the incidents the young daughter of a woman with whom Dority was or had been involved in a romantic relationship. And the victims themselves testified to the particulars of each of the relevant crimes. Our review shows that with regard to M. D., the evidence was sufficient to support the convictions of aggravated sodomy, aggravated child molestation, and enticing a child for indecent purposes. With regard to C. S., the evidence was sufficient to support the convictions of child molestation and enticing a child for indecent purposes.

2. Dority contends the trial court erred by admitting an unredacted portion of Berterra's interrogation interview of Dority over trial counsel's objection. Bertera arrested and interviewed Dority, and the interview was played to the jury during the trial. Trial counsel objected to certain portions of the interview being played for the

jury on the grounds that Bertera commented on the credibility of the victim, gave his opinion that M. D. had not been coached, made comments that invaded the province of the jury, and gave his opinion that something definitely happened to the child. Trial counsel added that Bertera was not an expert witness yet during the interrogation he professed his experience and status as a police officer. Finally, trial counsel cited OCGA § 24-6-620 in support of his argument and argued that the jury would be overly influenced by Bertera's comments. The trial court denied the objection on the ground that under OCGA § 24-7-704, "testimony in the form of an opinion or inference otherwise admissible shall not be objectionable because it embraces an ultimate issue to be decided by the trier of fact" and on the ground that the detective was simply confronting Dority about the allegations against him. The court allowed the relevant portions of the interview to be played without redacting Bertera's comments to which the defense objected.

Specifically, trial counsel objected to the following portions of the interview, during which Bertera questioned and confronted Dority about the allegations by M. D.:

> The description that she was giving was not of somebody that had been coached, it was that of somebody that had experienced it. Okay? Some

17

of the things that she talked about you can tell weren't coached, weren't told to her, because she used words in a child's version of how to describe things. For example, in her description of when something was being inserted into her. . . she described as . . . "it felt like a ball." That's her imagination processing what she's feeling, not being able to see it. Something's happened to this little girl. And so getting down to the truth is protecting that girl. I'm going to tell you, if she doesn't have some closure she's going to have to deal with this the rest of her life.

After these words, Bertera announced that he was going to leave the room. Dority then stated that he was being totally honest and denied that he had done anything to M. D. Bertera then left the room. After more than 15 minutes, Bertera returned for further questioning, and made the following comments.

Without a doubt something happened to this little girl. Was she molested? Without a doubt in my mind she experienced what she was talking about. In my experience and my training and that of the forensic examiner, and she has done hundreds and thousands of these interviews. She was concerned with the details. You can coach a child but you can't coach a child in terms of 9-year-old's talk; you know what I'm saying, something happened to this girl.

Dority replied that he was willing to believe that something had happened to his child.

"[A] sworn witness, generally speaking, should not be permitted to opine from the stand about whether another witness is truthful." *Roberts v. State*, 313 Ga. App. 849, 850-851 (2) (723 SE2d 73) (2012) (citations omitted); see also OCGA § 24-6-620 ("The credibility of a witness shall be a matter to be determined by the trier of fact[.]"). This rule, however, is inapplicable here because "[c]omments made [during a law enforcement interrogation] and designed to elicit a response from a suspect do not amount to opinion testimony, even when a recording of the comments is admitted at trial." *Roberts*, 313 Ga. App. at 851 (2) (citations omitted). "[L]aw enforcement interrogations are, by their very nature, attempts to determine the ultimate issue and the credibility of witnesses." *Collum v. State*, 281 Ga. 719, 723 (3) (642 SE2d 640) (2007). But, "[l]ike any other evidence, testimony reflecting comments made by an officer in the course of an interview ought not be admitted if the probative value of the testimony is substantially outweighed by its tendency to unduly arouse emotions of prejudice, hostility, or sympathy." *Butler v. State*, 292 Ga. 400, 406 (3) (a) (738 SE2d 74) (2013) (citation and footnote omitted); see also *Roberts*, 313 Ga. App. at 851 (2); OCGA § 24-4-403 ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). "The standard of review of the trial court's ruling on a challenge to evidence on the ground

19

that its probative value is outweighed by its tendency to unduly prejudice the jury is an abuse of discretion standard." *Holland v. State*, 221 Ga. App. 821, 825 (3) (472 SE2d 711) (1996) (citation omitted). As explained below, we find no breach of discretion.

As for the first paragraph quoted above, pretermitting whether the comments had any probative value, we find that they had little if any prejudicial effect. First, the comments are not a direct comment on the child's credibility; they only go to whether the child's statements revealed evidence of coaching. And "this Court has repeatedly held that a witness does not improperly bolster a victim's credibility by testifying that the witness saw no evidence of coaching." *Conley v. State*, 329 Ga. App. 96, 102 (a) (763 SE2d 881) (2014), citing *McCowan v. State*, 302 Ga. App. 555, 557 (1) (691 SE2d 360) (2010) (victim's mother's and nurse's statements that the victim's responses did not appear rehearsed did not bolster the victim's credibility). Thus the comments did not impermissibly bolster the victim's testimony or invade the province of the jury. *Anthony v. State*, 282 Ga. App. 457, 459 (2) (638 SE2d 877) (2006) (officer's testimony that victim exhibited no signs of deception during interview did not constitute bolstering); *Stillwell v. State*, 294 Ga. App. 805, 806-807 (2) (a) (670 SE2d 452) (2008) (lawyer's statement that he did not see any evidence that child had

been coached did not impermissibly address the ultimate issue before the jury or bolster the child's credibility). Further, the State presented other evidence from which the jury could assess M. D.'s credibility, including the consistency of her trial testimony, her forensic interview, and the testimony of the outcry witnesses, as well as Dority's reactions during his interrogation and items found in Dority's house that the child mentioned in her testimony. Accordingly, we conclude that Dority has not shown that the probative value of the first paragraph of the officer's comments is substantially outweighed by the danger of unfair prejudice, and, therefore, the trial court did not breach its discretion by denying Dority's request to redact those comments.

To the extent Bertera commented on coaching in the second paragraph quoted above, the same analysis just given applies. In the remainder of the second paragraph, Bertera stated that based on his experience as an officer and relying on expertise of the forensic examiner as well, something definitely happened to M. D. But this comment had some probative value given that it was followed by Dority stating that he was willing to believe that something happened to M. D. See, e.g., *Roberts*, 313 Ga. App. at 851-852 (2) (interrogation comments had probative value where they were part of a confrontational technique that yielded an admission from the

21

defendant); *Butler*, 292 Ga. at 406 (3) (a) (challenged interrogation statements were followed shortly by defendant's admission that he hit the victim). The comments at issue here may have had some prejudicial effect given that there was no physical evidence of the crime. But a reasonable juror would understand that the only reason an officer was interrogating the suspect was that the officer believed the account of the victim and thought the defendant was a suspect. *Roberts*, 313 Ga. App. at 851 (2). Given these factors and the totality of the State's evidence, we cannot say that the trial court abused its discretion by determining that the probative value of the questioning exceeded any possible prejudicial effect. Id.; *Dubose v. State*, 294 Ga. 579, 587-588 (6) (b) (755 SE2d 174) (2014) (interrogation questions produced probative information regarding changes in defendant's story, and, under the circumstances, any reasonable juror would have expected that interrogator did not believe defendant's first story); *Butler*, 292 Ga. at 406-407 (3) (a) (probative value of interrogation comments which led to defendant changing his story exceeded possible prejudicial effect); compare *Axelburg v. State*, 294 Ga. App. 612, 618 (2) (669 SE2d 439) (2008) (where "officer expressed a professedly expert opinion on the defendant's sleepwalking defense and general credibility in a case in which the sleepwalking issue played a central role[, t]he officer's statements impermissibly

22

bolstered other testimony on this issue, which was the subject of significant dispute between the parties' expert witnesses at trial").

3. Dority contends the trial court erred by allowing the similar transaction involving L. D.[4] He claims the State failed to establish that Dority's activities with L. D. constituted child molestation, as the trial court held. We agree with the trial court.

"We review a trial court's evidentiary rulings under an abuse of discretion standard of review. However, we accept a trial court's factual findings unless they are clearly erroneous." *McCoy v. State*, 332 Ga. App. 626, 628 (774 SE2d 179) (2015) (citations omitted).

OCGA § 24-4-413 (a) provides:

> In a criminal proceeding in which the accused is accused of an offense of sexual assault, evidence of the accused's commission of another offense of sexual assault shall be admissible and may be considered for its bearing on any matter to which it is relevant.

___

[4] Dority couches this argument both as an error of the trial court and as ineffective assistance of counsel on the ground that trial counsel failed to properly object to the evidence of the similar transaction. Our review shows that trial counsel did object, and therefore we review this enumeration only for error by the trial court in admitting the evidence.

And OCGA § 24-4-414 (a) provides:

> In a criminal proceeding in which the accused is accused of an offense of child molestation, evidence of the accused's commission of another offense of child molestation shall be admissible and may be considered for its bearing on any matter to which it is relevant.

"The child molestation statute [OCGA § 16-6-4 (a)[5]] . . . requires only that the defendant have acted with the intent to arouse his sexual desires. [And t]he question of intent is peculiarly a question of fact for determination by the jury[.]" *Brown v. State*, 324 Ga. App. 718, 720-721 (1) (751 SE2d 517) (2013) (citations and punctuation omitted). A jury could determine that Dority took the actions with regard to L. D. with the intent to arouse his sexual desires, especially given that Dority asked L. D. if she felt like he would molest her. See, e.g., *Cavender v. State*, 329 Ga. App. 845, 849 (3) (b) (766 SE2d 196) (2014) (evidence that defendant lifted victim's bedcovers to stare at her buttocks while she was sleeping was sufficient to support a conviction of child molestation).

---

[5] OCGA § 16-6-4 (a) provides that "[a] person commits the offense of child molestation when such person: (1) Does any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person."

Dority also contends the incident involving L. D. was not admissible under OCGA § 24-4-404 (b).[6] But OCGA § 24-4-414 (a) is the more specific statute regarding admission of prior acts of child molestation and is therefore controlling over OCGA § 24-4-404 (b). See *Vines v. State*, 269 Ga. 438, 440 (499 SE2d 630) (1998) ("For purposes of statutory interpretation, a specific statute will prevail over a general statute, absent any indication of a contrary legislative intent.") (citation omitted); see also *United States v. Brimm*, 608 F. Appx. 795, 798 (I) (B) (11th Cir. 2015) ("[FRCP] Rules 413 and 414 permit the introduction of propensity evidence and thus contain exceptions to Rule 404 (b)'s general ban on propensity evidence in "sexual assault" and "child molestation" cases.") (citations omitted).

4. Dority claims that his trial counsel was ineffective in nine ways. Under *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SC 2052, 80 LE2d 674) (1984), the appellant "must prove both that his trial counsel's performance was

[6] OCGA § 24-4-404 (b) provides as follows:
Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

25

deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. [Cit.]" *White v. State*, 283 Ga. 566, 569 (4) (662 SE2d 131) (2008). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Rector v. State*, 285 Ga. 714, 716, 717 (6) (681 SE2d 157) (2009) (citations omitted). On claims of ineffective assistance of counsel, Georgia appellate courts will uphold a trial court's findings of fact unless they are clearly erroneous but review legal conclusions de novo. *Hunter v. State*, 281 Ga. 526, 528 (2) (a) (640 SE2d 271) (2007); *Cherry v. State*, 283 Ga. App. 700 (1) (642 SE2d 369) (2007).

In reviewing a claim of ineffective assistance of counsel, we remember that "[t]here is a strong presumption that counsel's conduct falls within the range of sound trial strategy and reasonable professional judgment." *Newkirk v. State*, 290 Ga. 581, 582 (2) (722 SE2d 760) (2012) (citation omitted).

> [A]nd the defendant bears the burden of overcoming this presumption. To carry that burden, the defendant must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not, or put another way, that his lawyer made errors so serious that he was not functioning as the counsel guaranteed the defendant by the Sixth Amendment.

*State v. Worsley*, 293 Ga. 315, 323-324 (3) (745 SE2d 617) (2013) (citations and punctuation omitted). Further, as the trial court noted during the hearing on ineffectiveness in this case, "hindsight has no place in an assessment of the performance of trial counsel, and a lawyer second-guessing his own performance with the benefit of hindsight has no significance for an ineffective assistance of counsel claim." *Shaw v. State*, 292 Ga. 871, 876 (3) (a), n. 9 (742 SE2d 707) (2013) (citation omitted).

For background, we note that trial counsel testified that his trial strategy with regard to M. D. was to assert that Erlande and Dority were hostile to each other, that Erlande had made up the allegations, and that M. D. had been coached during the ten-day trip to Florida on what to say to the police. His strategy with regard to C. S. was to assert that the C. S. allegations were a ploy by the Spriggses to gain advantage in a custody dispute with Rogers.

(a) Dority first contends that trial counsel failed to properly object when Detective Bertera commented on Dority missing a meeting with Bertera during the investigation, thereby violating the "bright-line rule in Georgia that the State may not comment on either a defendant's silence prior to arrest or failure to come forward

27

voluntarily." *Sanders v. State*, 290 Ga. 637, 640-641 (4) (723 SE2d 436) (2012) (citations omitted).

The evidence showed that Dority voluntarily met with Bertera a first time, waived his *Miranda* rights, was interviewed and was asked to meet again; a second meeting was scheduled. Bertera testified that Dority later cancelled the second meeting, saying that his wife had been in a bad accident and was being rushed to the hospital. Bertera testified that he learned from another source that Dority was lying about his reason for cancelling and that when the second meeting eventually occurred and after rereading Dority his *Miranda* rights, he confronted Dority about lying about his excuse for cancelling the second meeting. Trial counsel objected to this testimony on the ground of hearsay and that the questions called for speculation. Dority contends that counsel was ineffective for not objecting on the ground that the testimony infringed on Dority's right to remain silent and against self-incrimination. See *Wallace v. State*, 272 Ga. 501, 503 (2) (530 SE2d 721) (2000) (failure to object at trial to testimony on the ground that it improperly reflected on the defendant's right to remain silent, waived that issue on appeal). Trial counsel offered no tactical reason for failing to object on these grounds.

28

We find no ineffective assistance because the proposed objection would not have been meritorious. See *Young v. State*, 328 Ga. App. 857, 859 (1) (763 SE2d 137) (2014) ("Failure to make a meritless or futile objection or motion cannot be evidence of ineffective assistance.") (citation omitted). Dority did not fail to come forward or assert his right to remain silent; rather, he made arrangements to come forward, cancelled the arrangements, eventually came forward, and then waived his right to remain silent and spoke to Bertera. Thus, ultimately, Dority did not exercise his right to remain silent, he chose to talk to the police, and no deficiency on the part of trial counsel has been shown. See *Shaburov v. State*, 324 Ga. App. 743, 747 (1) (751 SE2d 540) (2013); *Fleming v. State*, 324 Ga. App. 481, 487 (3) (a) (749 SE2d 54) (2013).

(b) Dority contends that trial counsel failed to redact a 30-second portion of M. D.'s forensic interview and that as a consequence, the jury heard M. D. state that Dority had molested his younger daughter A. D. Dority points to the segment running from 1:21:20 to 1:21:50 on the interview; the record reflects that this time period was not redacted. But *appellate counsel* admitted at the motion for new trial hearing that the clip did not contain a direct allegation that Dority had molested this child. And our own review of the recording shows that the child begins by saying that nothing happened to A. D., and the remaining seconds of the clip are so difficult to understand

29

that the likelihood of a different trial outcome would have resulted if the information had been redacted is not substantial. *Hill v. State*, 291 Ga. 160, 164 (4) (728 SE2d 225) (2012) ("The likelihood of a different result must be substantial, not just conceivable.") (citation omitted.) Accordingly, we find no ineffective assistance of counsel on this point.

(c) Dority contends trial counsel was ineffective because he failed to request a hearing to determine whether the circumstances surrounding C. S.'s and M. D.'s outcry statements to Erlande Dority and to the Spriggses, respectively, had sufficient indicia of reliability to be admitted into evidence as hearsay by those witnesses. See *Gregg v. State*, 201 Ga. App. 238 (3) (411 SE2d 65) (1991). At the hearing on the motion for new trial, trial counsel testified that he did not request such a hearing because he thought a child's hearsay statements were automatically admissible if the children testified. In the ruling on the motion for new trial, the trial court found that a hearing was not necessary and that the evidence against Dority was "extremely strong," that both victims were "very credible," and that "the other evidence of other statements the children made was reliable."

Under the law in effect at the time of trial, statements by children under age 14 describing any act of sexual contact on or with the child were admissible by the

30

testimony of the person to whom made if the child was available to testify *and* the court found that sufficient indicia of reliability were present. See former OCGA § 24-8-820.[7] Thus, trial counsel erred by concluding that the availability of the children to testify at trial was the only relevant factor necessary at the time to allow the child hearsay evidence. Nevertheless, a hearing to determine the indicia of reliability of such statements was not a strict condition precedent to the admissibility of the statements. *Gregg*, 201 Ga. App. at 239 (3) (a); *Reynolds v. State*, 257 Ga. 725, 726 (2) (363 SE2d 249) (1988). "[T]his statutory requirement is met if after both parties have rested, the record contains evidence which would support . . . a finding [of indicia of reliability]." *Gregg*, 201 Ga. App. at 239 (3) (a). "[A]s long as sufficient

---

[7] From Jan. 1, 2013 to July 1, 2013, OCGA § 24-8-820 provided as follows: A statement made by a child under the age of 14 years describing any act of sexual contact or physical abuse performed with or on the child by another shall be admissible in evidence by the testimony of the person to whom made if the child is available to testify in the proceedings and the court finds that the circumstances of the statement provide sufficient indicia of reliability.

See 2011 Ga. Laws, p. 99, Act 52, § 2 (effective January 1, 2013); 2013 Ga. Laws, Act 84 § 13 (effective July 1, 2013). For trials occurring after July 1, 2013, a showing of indicia of reliability is no longer a requirement for allowing child hearsay evidence. See OCGA § 24-8-820 (also changing age to 16).

31

evidence of indicia of reliability appears in the record either before or after the introduction of the child's out-of-court statements, the fair trial rights of the defendant are adequately protected." Id. at 240 (a). Even so, "it may be advisable in some situations to hold such a hearing outside the presence of the jury," *Reynolds*, 257 Ga. at 726 (2), and this Court has held that under certain circumstances, a pretrial hearing outside the presence of the jury can be necessary to prevent harm to the defendant from the admission of unreliable child hearsay statements. *Ferreri v. State*, 267 Ga. App. 811, 814-815 (600 SE2d 793) (2004); see also *Roberson v. State*, 241 Ga. App. 226, 227 (1) (526 SE2d 428) (1999) ("Cases decided by the appellate courts of this state make clear, however, that when evidentiary rules conflict with the provisions of the child hearsay statute, a separate hearing may be necessary to avoid the presentation of inadmissible matter to the jury."). But see *Whorton v. State*, 321 Ga. App. 335, 340 (741 SE2d 653) (2013) ("to the extent that our decision in *Ferreri* can possibly be read as *requiring* a pre-trial *Gregg* hearing in "some situations," that case is of no precedential utility for such a proposition") (footnote omitted).[8]

---

[8] It must be noted that *Whorton* did not overrule the opinion in *Ferreri*. See *Ware County. v. Medlock*, 192 Ga. App. 542, 543 (385 SE2d 429) (1989) (majority of whole court required to overrule prior precedent of this Court).

On appeal, Dority argues that the evidence failed to show indicia of reliability because the audio recording made by the Spriggses of C. S.'s initial outcry, which trial counsel received on the eve of trial and successfully kept out of the evidence, shows that the outcry was unreliable because of the way the Spriggses questioned the child. He also argues that the Medlin report shows that C. S. made accusations involving other people, recanted some of those accusations, and made contradictory accusations and that the report raised suspicions about Tressa Spriggs's credibility. He further argues that the outcry statement by M. D. to Erlande raised reliability concerns, such as that the outcry came before a spanking, ten days elapsed between the outcry and the report to police thereby allowing Erlande to coach the child, the mother retracted the child's outcry at the first appearance hearing (about which trial counsel had no knowledge at the time of trial), and contradictions existed regarding the details of the assaults given by the child.

Although it may have been preferable to have had a hearing on the victims' statements' indicia of reliability outside of the presence of the jury given that trial counsel did not want to admit the Spriggs-C. S. outcry audio and the Medlin report into evidence, we find no possible harm. The trial court was able to review both items at or before the hearing on the motion for new trial (Dority submitted them as a part

33

of the post-trial proceedings), and the trial court ultimately found the victims' statements to be reliable. Thus, because "the trial court ultimately found the statements reliable [based on all the evidence] and admitted them and obviously would have done the same following a separate hearing," we find no error. *Reynolds*, 257 Ga. at 726 (2). Accordingly, we find no ineffective assistance of counsel on this point.

(d) Dority contends that trial counsel was ineffective because he failed to call three witnesses in Dority's defense: C. S.'s mother, Loria Rogers; Dority's mother, Joyce Drayton; and the appellant's adopted daughter, L. D. "A decision as to which defense witnesses to call is a matter of counsel's trial strategy and tactics and will not support a claim of ineffective assistance of counsel unless it is so unreasonable that no competent attorney would have made the decision under the circumstances." *Shockley v. State*, 297 Ga. 661, 666 (3) (777 SE2d 245) (2015) (citation omitted). The trial court found that the offered testimony was not "particularly helpful to the defendant."

(i) Trial counsel testified that his strategy with regard to victim C. S. was to show that C. S.'s allegations were the result of a custody dispute between Rogers and the Spriggses. Yet when asked if he interviewed Rogers prior to trial, he twice

34

testified, "I don't believe I did," although he also testified, "There's a possibility I did, but I can't remember off the top of my head." He also testified that he had no tactical reason for not calling her as a witness. Assuming for the moment that trial counsel failed to interview Rogers, we conclude that no reasonable defense attorney would have failed to interview, or at least attempt to interview, the mother of the victim, with whom the child lived during the time the incidents allegedly occurred, to see what she knew about her daughter's allegations against Dority. Had trial counsel done so, he would have gained valuable testimony to the effect that the child never made an outcry to her mother at the time of the alleged events; that she loved Dority, was comfortable around him, and called him "Dad"; that Tressa Spriggs hated Rogers and was motivated to gain C. S. in the custody dispute; that C. S. had not seen Dority for more than a year before the outcry; and that, months after the outcry to Tressa Spriggs, C. S. denied being improperly touched by Dority.

Nevertheless, had trial counsel interviewed Rogers he also would have discovered that C. S. told Rogers that Dority may have taken little girls into his room one at a time, specifically, that when Dority "almost" touched her, "we were standing in a line and he had us all lined up, and I was at the back of the line and it was getting late and we had to go to bed. . . and he just told us all to go to bed." Trial counsel also

35

would have learned that Rogers admitted that Dority was always very concerned with his children's cleanliness and once cleaned another young girl's anus with a Q-tip after she used the bathroom, and that Rogers herself had credibility issues in that she spoke to C. S. about wishing Dority was back in her life to prove something to the courts, in that she had lost custody of C. S. due to her own behavior, and in that she did not tell *anyone*, including Dority whose trial was pending, after purportedly hearing C. S. say that Dority never touched her. "A reasonable lawyer might . . . have been reasonably concerned about harmful cross-examination." *Worsley*, 293 Ga. at 327 (4). Thus, when considering this allegation of ineffective assistance alone, we cannot conclude that the trial result would have been different if not for the deficient performance.

(ii) Dority contends that trial counsel should have called Dority's mother, Joyce Drayton, to testify that M. D. had never before reported any inappropriate touching by Dority prior to the outcry; that the child appeared to refer to only one incident during her outcry to Drayton; that M. D. had dubious credibility and looked down while speaking to Drayton; that Erlande appeared to be more concerned about her trip to Florida than M. D.; and that Drayton told Erlande that she should take the child to the doctor and have her examined but that Erlande went to Florida anyway. Trial

counsel testified at the hearing that he chose not to call Drayton because he spoke to her and he did not want another outcry witness on the stand to buttress the child's story. Such a decision is strategic, and therefore we find no error. See *Phillips v. State*, 277 Ga. 161, 163-164 (b) (587 SE2d 45) (2003) ("Informed strategic decisions do not constitute ineffective legal assistance.") (citation omitted).

(iii) Before trial, trial counsel spoke to L. D., the similar transaction witness; trial counsel remembers that L. D. was supportive of Dority but that she did not really want to be involved in the trial. During that conversation, L. D. never told trial counsel about Erlande's retraction of M. D.'s claims against Dority, which occurred at Dority's first appearance hearing,[9] and which L. D. apparently witnessed, and therefore he did not cross examine Erlande on this point. If he had known of the retraction, trial counsel could have cross examined Erlande about it. Trial counsel testified, "[T]rust me, I could have used that." Although the trial court found this evidence of no serious consequence, a retraction by M. D.'s mother, the first witness to her outcry, would have been a valuable piece of evidence for the defense.

---

[9] Although trial counsel testified that someone from the public defender's office normally would have been at the first appearance hearing and would have taken notes, Dority has not established that any such person was present or that the public defender's office was negligent in not conveying any information to trial counsel.

Nevertheless, trial counsel cannot be faulted for not interviewing L. D. sufficiently to uncover this uncommon piece of knowledge from this hostile and reticent witness. L. D. was called to trial to testify about events involving her that occurred approximately 18 years prior to trial. Trial counsel cross-examined her regarding logically related topics, such as whether her father ever touched her and whether they got along in the ensuing years. Whether this witness attended an early hearing in Dority's criminal prosecution regarding a different victim is not directly related to why the State called L. D. to testify. Thus, trial counsel had little reason to suspect that L. D. would have such knowledge and therefore little reason to pursue such a line of questioning. In sum, recognizing that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U. S. at 690, we cannot conclude that Dority has overcome the presumption that trial counsel sufficiently interviewed L. D. prior to trial.

(e) Dority contends trial counsel failed to exploit the Medlin Report and the C. S./Spriggs outcry audio as means for attacking the credibility of C. S. and the Spriggs. "The manner in which an attorney attacks the credibility of a witness falls within the ambit of trial tactics. [And t]he scope of cross-examination is grounded in trial tactics

and strategy, and will rarely constitute ineffective assistance of counsel." *Smith v. State*, 304 Ga. App. 846, 848 (698 SE2d 355) (2010) (citations and punctuation omitted).

(i) Trial counsel testified that he did not attempt to introduce the Medlin Report, which he had for one or two months prior to trial, because he was not sure whether he should have the report in the first place because the report might be protected by a privilege. But trial counsel also testified that he used some of the information in the Medlin report to successfully cross-examine Chad Spriggs, including to get an admission that C. S. had accused another person of touching her and had not recanted. According to trial counsel, "They answered the question the way I wanted them to answer." In its order denying Dority's motion for new trial, the trial court found that the Medlin Report was consistent with C. S.'s trial testimony; that C. S. reported that Dority had touched her four times; that C. S. reported that Dority had touched other girls; that the interview and diagnostic tests showed that C. S. had flashbacks of the abuse, was scared of men, was afraid that someone would kill her, and did not trust people because they might want sex; and that C. S. was experiencing emotional and behavioral difficulties and sexualized behaviors that likely stemmed from the reported history of neglect and abuse. After reviewing the

report, the court understood why trial counsel "had reservations" about using it at trial. We agree and find no possible harm even if trial counsel erred by assuming that he was not authorized to use the report. See *Sullivan v. Kemp*, 293 Ga. 770, 774 (2) (749 SE2d 721) (2013) (where defense counsel's choice "was based upon his lack of understanding of or familiarity with the relevant law" it is not strategic and can constitute deficient performance) (citations omitted).

(ii) Trial counsel testified that on the Friday before trial, the State gave him an audio recording of C. S.'s initial outcry to Tressa Spriggs, in which, trial counsel admitted, Tressa used suggestive questioning techniques that might have influenced the child's report. Thus, the audio gave trial counsel an opportunity to further his trial strategy of showing that the C. S. allegations were a ploy by the Spriggses to gain custody of C. S. Trial counsel testified, however, that he listened to the recording several times and concluded that although some elements might have been helpful to Dority's case (e.g., pointing out the suggestiveness of the questions and how the Spriggses could be accused of coaching the child), the audio was prejudicial because it revealed that the child was emotional and crying when answering questions about the alleged incidents. Trial counsel concluded, "strategically, I don't want that girl crying . . . on the stand" especially through the testimony of the last witness of the

State's case. Because we cannot conclude that no reasonable counsel would have made the same choice, we find no ineffective assistance on this point.

(f) Dority contends trial counsel failed to exploit Erlande's comments from Dority's first appearance hearing and other contradictions in the evidence as means for attacking the credibility of M. D. and Erlande Dority. As explained above, trial counsel cannot be faulted for not interviewing similar transaction witness L. D. sufficiently to uncover the fact that she witnessed Erlande Dority retract her daughter's allegations against Dority.

As for other contradictions in the evidence not already addressed in other divisions in this opinion, Dority points to the fact that some evidence not admitted at trial would have shown that M. D. gave varying accounts to different people of which room the abuse occurred in, how long the abuse had occurred, and what position she was in during the abuse. But trial counsel testified that he did not want to "beat up" on the child too much in the witness stand and that he was trying to minimize testimony about sexual activity as much as possible. Trial counsel did cross examine M. D. on her outcry to her mother when she was about to be spanked and her failure to tell anyone about the alleged abuse while she was in Florida for ten days with her mother and sister. Although trial counsel could, perhaps, have done more, we

41

conclude that with regard to the alleged failure to attack other inconsistencies in the testimony, Dority has failed to overcome the strong presumption that counsel's conduct falls within the broad range of reasonable professional conduct.

(g) Dority contends the trial court erred by giving an overly broad jury charge on Count 5; Dority also apparently asserts that trial counsel was ineffective by failing to object to the trial court's charge on Count 5 as given. In that count, Dority was charged with child molestation for placing his hand on C. S.'s genital area, but the court charged the jury with the statutory definition of child molestation, which provides that a person commits the offense by doing "any immoral or indecent act" to or in the presence of the child with a sexual intent. OCGA § 16-6-4 (a) (1). Thus, Dority argues, the jury could have convicted him of molesting C. S. for other behavior reported at trial, including that Dority showed pornographic movies to C. S., washed her and others, and touched the child in other ways. Trial counsel testified that objecting to the jury charge didn't "enter his mind." The trial court held that the jury charge did not improperly expand the indictment.

Because trial counsel did not object, we review the trial court's decision to give the instruction for plain error. See OCGA § 17-8-58 (b) (providing that the failure to object regarding a jury instruction at trial precludes appellate review unless "the jury

42

charge constitutes plain error which affects substantial rights of the parties" (citation omitted)); *Thomas v. State*, __ Ga. __ (2) (Case No. S15A0796, decided Oct. 5, 2015). Plain error requires a showing that "the instruction was erroneous, the error was obvious, the instruction likely affected the outcome of the proceedings, and the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *Lake v. State*, 293 Ga. 56, 59 (5) (743 SE2d 414) (2013) (citations and punctuation omitted.). We find no plain error because the trial court read the indictment to the jury and charged the jury that the State must "prove every material allegation in the indictment," that the indictment "states the exact offense," and that the jury was to "read [the indictment] carefully." *Schneider v. State*, 312 Ga. App. 504, 507-508 (2) (718 SE2d 833) (2011) (reversal not mandated where "charge as a whole limits the jury's consideration to the specific manner of committing the crime alleged in the indictment.") (citation omitted). There being no plain error in the complete charge as given by the court, Dority can show no ineffective assistance of counsel for failure to object to the charge as given. See *Thomas*, __ Ga. at __ (5); *Hughley v. State*, 330 Ga. App. 786, 794 (4) (c) (769 SE2d 537) (2015).

(h) Dority contends trial counsel was ineffective for failing to request funding for an expert to respond to the State's expert medical testimony, to criticize the

43

State's forensic interview evidence, and to attack the credibility of the victim's outcry evidence.

The State called a hospital nurse practitioner to explain that although M. D.'s medical exam was normal, any physical injury resulting from the alleged abuse could have healed before the child was seen by a doctor. At a hearing on the motion for new trial, trial counsel testified that he did not consider getting an expert to rebut that testimony because, given that the State's medical witness testified that the child had no indication of an injury, on cross examination he could show, and did show, that the nurse's testimony was consistent with his client's innocence. Trial counsel testified, "[T]hat was a fact to our advantage and I was happy with that." Thus, the decision was strategic and cannot be seen as ineffective assistance of counsel. Compare *Ottley v. State*, 325 Ga. App. 15, 19-20 (2) (752 SE2d 92) (2013) (in a case where the State's expert gave strong evidence to support the State's allegations of sexual abuse of child, trial counsel's performance was deficient where, based in part on a misunderstanding of the law, he failed to investigate the State's expert's credentials, to interview State's experts prior to trial, to research the relevant medical issues, to cross examine and refute the State's experts, and to consult or call any

44

medical expert to support the defense theory that the child fabricated the story and the allegations could not have happened).

The State introduced forensic interviews of the child victims: an interview of M. D. made at Children's Healthcare of Atlanta; and an interview of C. S. by Detective West. With regard to the M. D. interview, trial counsel thought that the interview techniques were not suggestive. He testified that "Scottish Rite asks . . . open-ended questions." In his opinion, he did not feel it was appropriate to get an expert on the matter. Thus, the decision was strategic. With regard to C. S., trial counsel did not believe that the West interview came off as suggestive. He testified that he cross-examined West on the issues he saw and did not feel like he needed an expert to assist him. Again, trial counsel's decision was strategic, and we therefore find no deficient performance. See, e.g., *Keith v. State*, 279 Ga. App. 819, 825 (6) (a) (632 SE2d 669) (2006) (where trial counsel reviewed victim's video statement, "did not believe that [victim] had been coached by the interviewer and therefore did not think it was necessary to hire an expert to review the videotape[,] . . .[his] decisions were all strategic"); *Gawlak v. State*, 310 Ga. App. 757, 759-760 (2) (a) (714 SE2d 354) (2011) (where trial attorney chose to cross examine victim's interviewer about

45

interviewing techniques and did so, there was no ineffective assistance of counsel for failing to call an expert to attack the interviewing techniques).

Dority also argues that trial counsel should have sought an expert to comment on factors that may have affected the credibility of the two victims' initial outcries, such as the delay in reporting each incident to the authorities, whether the child had contact with other individuals in the interim, Erlande's retraction of M. D.'s assertions, and various contradictions in the evidence regarding the children's assertions. Trial counsel did not think that he needed an expert to explain the impact of the delay between an outcry and a report to police. Compare *Darst v. State*, 323 Ga. App. 614, 623 (2) (ii) (746 SE2d 865) (2013) (trial counsel had not made a conscious strategic decision about whether to use an expert regarding behavioral patterns of sexually abused children) (physical precedent only). And, generally, expert opinion testimony that directly addresses the credibility of the victim is forbidden. *Odom v. State*, 243 Ga. App. 227, 228 (1) (531 SE2d 207) (2000); see also OCGA § 24-6-620 ("The credibility of a witness shall be a matter to be determined by the trier of fact"); *Handley v. State*, 289 Ga. 786, 786 (1) (716 SE2d 176) (2011) ("the credibility of eyewitness testimony is within the exclusive province of the jury") (citations omitted). We conclude that Dority has failed to overcome the strong

46

presumption that counsel's conduct falls within the broad range of reasonable professional conduct.

(i) Finally, Dority contends trial counsel was deficient in that he failed to seek the victims' DFCS and juvenile court records, therapy records, school records, and pediatric records during his investigation of the case.

At the hearing on Dority's request that the trial court order the production of the above described documents for an in camera review, trial counsel testified about his decision regarding whether to seek the victims's records in his defense of Dority. Almost uniformly with regard to both victims and each category of documents, trial counsel testified that he never had any indication that any such documents would have assisted him in defending Dority, and that he thought his resources were better spent focusing on other matters, such as that the State initially intended to present four similar transaction witnesses. He also testified that he knew the victims had only entered therapy after their outcries; that he received some DFCS records and would have to "guess" that additional DFCS records could have been beneficial; and that even though M. D. asserted that the incidents started three years earlier, he did not seek medical records for the same reason he did not seek a medical expert: the State's evidence was consistent with innocence and therefore worked to Dority's advantage.

47

In its order denying the motion for post-trial subpoenas, the trial court held that Dority's appellate counsel presented no factual support for a "fishing expedition" into these records. The trial court noted that *Darst*, 323 Ga. App. 614, upon which Dority relied regarding the request for subpoenas, was physical precedent only and was based on dissimilar facts. And the trial court concluded that Dority had not shown a prima facie need for the documents as required by case law to overcome applicable privileges. Thus, the court concluded that trial counsel had not been ineffective in failing to seek the documents listed above. On appeal, Dority argues that aspects of the evidence, including the delayed outcries, the motives of the parental figures, the delayed reporting to authorities, and the inconsistencies in the victims' stories, cast doubt on the reliability of the victims' outcries and testimony and should have prompted trial counsel to seek the records. He continues that, as the sought-after records could shed further light on the victims' reliability, they are "potentially exculpatory,"

Remembering that there is a strong presumption that counsel's conduct falls within the range of sound trial strategy and reasonable professional judgment and that the appellant bears the burden of overcoming this presumption by showing that no reasonable lawyer would have made the same decision, *Newkirk*, 290 Ga. at 582 (2),

48

we conclude that Dority has not overcome this presumption. Here, trial counsel offered a reason for his decision not to seek additional records. Trial counsel in *Darst* offered no strategic reason for failing to seek similar records prior to trial. *Darst*, 323 Ga. App. at 619-620 (2) (i) (trial counsel decided "he would just 'let it go' and try to use the absence of the records to Darst's advantage at trial"). Moreover, *Darst* is physical precedent only, and it is based on more general case law about trial counsel's failure to investigate a case based on inattentiveness and to further investigate where there was evidence that would have caused a reasonably competent counsel to take additional steps, Id. at 621 (2) (i), neither of which is the case here. The simple fact that additional documents might have been helpful is not enough. Cf. *Sims v. State*, 251 Ga. 877, 880 (4) (c) (311 SE2d 161) (1984) ("It is not enough to assert that expert analysis might produce evidence helpful to the defense, i.e., to embark on a "fishing expedition.").

When considering the prejudice prong for multiple claims of ineffective assistance of counsel, we look to whether "the cumulative effect of counsel's alleged errors," leads to "a reasonable probability that the outcome of the trial would have been different." *Schofield v. Holsey*, 281 Ga. 809, 812 (II), n. 1 (642 SE2d 56) (2007). Here, we have concluded that trial counsel was deficient in only one manner—failing

to interview and call Loria Rogers—but that Dority has not shown the harm prong of the *Strickland* analysis with regard to Rogers's testimony. Accordingly, Dority's claims of ineffective assistance fail. As stated by the Supreme Court in *Strickland*, "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. 668 at 686 (II). For all of the above reasons, we conclude that Dority has not shown that trial counsel failed according to this benchmark.

5. Finally, Dority has moved this Court to remand the case and order the trial court to obtain the victims' DFCS and juvenile court records, therapy records, school records, and pediatric records so that appellate counsel can attempt to determine whether Dority was harmed by trial counsel's failure to seek these same records; he argues that the trial court was required to have an in camera inspection of the records. Appellate counsel admits that he does not know what the sought after documents would show. He also contends the trial court erred by denying his request for funds to hire an expert to review the documents to assess their importance. Because, as we have already found, trial counsel was not deficient in not seeking the above-listed documents, we need not address any potential associated harm. We conclude that the

trial court did not err by denying Dority's request to obtain these documents for the purpose of his appeal or to obtain funds to hire an expert, and we therefore deny the motion to remand.

*Judgment affirmed. Andrews, P. J., and Miller, J., concur*.